SAXENA WHITE P.A.
Lester R. Hooker (SBN 241590)
2424 N. Federal Highway
Suite 257
Boca Raton, FL 33431
Telephone: 561-394-3399
Facsimile: 561-394-3382
lhooker@saxenawhite.com

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DEBRA L. BERNSTEIN, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br>vs.<br><br>BIGBAND NETWORKS, INC., AMIR BASSAN-ESKENAZI, RAN OZ, FREDERICK A. BALL, GAL ISRAELY, DEAN GILBERT, KENNETH A. GOLDMAN, LLOYD CARNEY, BRUCE I. SACHS, ROBERT J. SACHS, GEOFFREY Y. YANG, MORGAN STANLEY & CO. INCORPORATED, JEFFERIES & COMPANY, INC., MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED, COWEN AND COMPANY, LLC and THINKEQUITY PARTNERS LLC,<br><br>Defendants. | Case No.<br><br>CLASS ACTION<br><br>COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS<br><br><br><br><br><br><br><br><br><br>DEMAND FOR JURY TRIAL |

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of all purchasers of the common stock of BigBand Networks, Inc. ("BigBand" or the "Company") who purchased or otherwise acquired BigBand's common stock pursuant or traceable to the Company's March 14, 2007 Initial Public Offering (the "IPO" or the "Offering"), seeking to pursue remedies under the Securities Act of 1933 (the "Securities Act"), and including those who purchased or otherwise acquired the Company's common stock between March 14, 2007 through September 27, 2007, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.     BigBand develops, markets, and sells network-based platforms that enable cable operators and telephone companies to offer video, voice and data services across coaxial, fiber and copper networks.  The Company's product applications of Digital simulcast, TelcoTV, Switched Broadcast, High-Speed Data and Voice-over-IP are used by service providers worldwide to offer video, voice, and data services to subscribers.

3.     On March 14, 2007, the Company commenced its IPO by filing a Registration Statement and Prospectus (collectively referred to hereinafter as the "Offering Documents") with the Securities and Exchange Commission ("SEC").  On March 20, 2007, BigBand closed its IPO, with the Company and certain stockholders selling 12.3 million shares of stock to investors at a price of $13.00 per share.  The IPO was a financial success for BigBand, as the Company and the selling stockholders reaped net proceeds of $148.8 million.

4.     After the close of the IPO, and because of the Company's materially misleading statements and omissions, BigBand's stock was reached a high of $21.43 per share on May 3, 2007.

5.     On August 2, 2007, the Company shocked investors when it reported disappointing second quarter 2007 financial results, and announced lowered guidance for its third quarter 2007 and year-end 2007 financial results.  Specifically, the Company stated that third quarter net revenues would be $54 to $58 million, and earnings (loss) per share ("EPS") would be ($0.01) to $0.03.  Further, for fiscal year 2007, the Company stated that net revenues would be in the range of $225 to $230 million, and EPS would be in the range of $0.03 to $0.08.

6.     On this news, shares of the Company's stock plunged $3.88 per share, or 27.75%, to close on August 3, 2007 at $10.10, on unusually heavy trading volume.  The announcement of the disappointing financial results for the second quarter 2007 – less than five months after the close of the IPO – raised questions regarding the price and timing of the IPO.

7.     On September 27, 2007, the Company shocked investors again by revising its revenue outlook for the third quarter of 2007, and indicated that revenue would be in the range of $35 to $39 million, well below its previous guidance of $54 to $58 million for the quarter.  The Company revealed that the lower revenue outlook resulted from the Company deploying SDV

1  across a number of customers and configurations, which required significant software
2  customization and integration. Additionally, the Company disclosed that it had experienced a
3  slowdown in TelcoTV revenues as its major customer worked through existing inventory. As a
4  result, the Company stated that it expected to report an operating loss for the third quarter of
5  fiscal year 2007.

6       8.    On this news, shares of the Company's stock declined an additional $2.67 per
7  share, or almost 30%, to close on September 28, 2007 at $6.40 per share, also on unusually
8  heavy trading volume.

9       9.    Finally, on October 30, 2007, the Company announced disappointing third quarter
10  financial results and details regarding a restructuring plan for the Company. Following this
11  announcement, the Company's stock price fell 9.9% to $6.00.

12       10.   The Offering Documents and statements throughout the Class Period were
13  materially false and misleading because they failed to disclose or indicate the following: (1) that
14  the Company's SDV products suffered from interoperability issues with regard to certain video
15  infrastructure systems; (2) that the integration of the Company's SDV products required
16  significant software customization and integration; (3) as such, growth of the Company's SDV
17  products and sales was stagnant; (4) that, as a result of the above, the Company would be forced
18  to recognize the revenue associated with its SDV product sales over an extended period of time;
19  (5) that the Company had shipped excess amounts of TelcoTV inventory to customers such as
20  Verizon, which reduced future demand for these products; and (6) that the Company lacked
21  adequate internal and financial controls.

22       11.   As a result of Defendants' wrongful acts and omissions, and the precipitous
23  decline in the market value of the Company's securities, Plaintiff and other Class Members have
24  suffered significant losses and damages.

25                        **JURISDICTION AND VENUE**

26       12.   The claims asserted herein arise under and pursuant to §§11, 12(a)(2) and 15 of
27  the Securities Act (15 U.S.C. §§ 77k and 77o), and under and pursuant to §§10(b) and 20(a) of

28

1   the Exchange Act, (15 U.S.C. §§78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder (17
2   C.F.R. §240.10b-5).

3       13.     This Court has jurisdiction of this action pursuant to §22 of the Securities Act [15
4   U.S.C. §77v] and pursuant to §27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. §§1331
5   and 1337.

6       14.     Venue is proper in this Judicial District pursuant to §22 of the Securities Act and
7   pursuant to §27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b).  Many of the
8   acts and transactions alleged herein, including the preparation and dissemination of materially
9   false and misleading information, occurred in substantial part in this Judicial District.
10  Additionally, the Company's principal executive offices are located within this Judicial District.

11      15.     In connection with the acts, conduct and other wrongs alleged in this Complaint,
12  Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce,
13  including, but not limited to, the United States mails, interstate telephone communications, and
14  the facilities of the national securities markets.

## PARTIES

16      16.     Plaintiff Debra L. Bernstein, as set forth in the accompanying certification
17  incorporated by reference herein, acquired BigBand's common stock during the Class Period and
18  pursuant and/or traceable to the IPO and has been damaged thereby.

19      17.     Defendant BigBand is a Delaware corporation with its principal executive offices
20  located at 475 Broadway Street, Redwood City, California 94063.  The Company develops,
21  markets, and sells network-based platforms that enable cable operators and telephone companies
22  to offer video, voice, and data services across coaxial, fiber, and copper networks.  BigBand's
23  stock trades in an efficient market on the NASDAQ under the symbol "BBND".

24      18.     Defendant Amir Bassan-Eskenazi ("Bassan-Eskenazi") was, at all relevant times,
25  the Company's President, Chief Executive Officer, and Chairman of the Board of Directors.
26  Defendant Bassan-Eskenazi signed or authorized the signing of the false and misleading Offering
27  Documents.

28

1        19.     Defendant Ran Oz ("Oz") was, at all relevant times, the Company's Chief

2 Technology Officer, Executive Vice President, and a member of the Board of Directors.

3 Defendant Oz signed or authorized the signing of the false and misleading Offering Documents.

4        20.     Defendant Frederick Ball ("Ball") was, at all relevant times, the Company's

5 Financial Officer, Senior Vice President, and Executive Vice President.  Defendant Ball signed

6 or authorized the signing of the false and misleading Offering Documents.

7        21.     Defendant Gal Israely ("Israely") was, at all relevant times, a member of the

8 Company's Board of Directors.  Defendant Israely signed or authorized the signing of the false

9 and misleading Offering Documents.

10        22.     Defendant Dean Gilbert ("Gilbert") was, at all relevant times, a member of the

11 Company's Board of Directors.  Defendant Gilbert signed or authorized the signing of the false

12 and misleading Offering Documents.

13        23.     Defendant Ken Goldman ("Goldman") was, at all relevant times, a member of the

14 Company's Board of Directors.  Defendant Goldman signed or authorized the signing of the

15 false and misleading Offering Documents.

16        24.     Defendant Lloyd Carney ("Carney") was, at all relevant times, a member of the

17 Company's Board of Directors.  Defendant Carney signed or authorized the signing of the false

18 and misleading Offering Documents.

19        25.     Defendant Bruce I. Sachs ("B. Sachs") was, at all relevant times, a member of the

20 Company's Board of Directors.  Defendant B. Sachs signed or authorized the signing of the false

21 and misleading Offering Documents.

22        26.     Defendant Robert J. Sachs ("R. Sachs") was, at all relevant times, a member of

23 the Company's Board of Directors.  Defendant R. Sachs signed or authorized the signing of the

24 false and misleading Offering Documents.

25        27.     Defendant Geoffrey Yang ("Yang") was, at all relevant times, a member of the

26 Company's Board of Directors.  Defendant Yang signed or authorized the signing of the false

27 and misleading Offering Documents.

28

28.     Defendants Bassan-Eskenazi, Oz, Ball, Israely, Gilbert, Goldman, Carney, B. Sachs, R. Sachs, and Yang are collectively referred to hereinafter as the "Individual Defendants."

29.     The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of BigBand's quarterly reports, documents, and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market.  Each Defendant was provided with copies of the Company's reports and documents alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.

30.     Because of their positions and access to material non-public information available to them, each of these Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and misleading.

31.     The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group published" information and the result of the collective actions of the Individual Defendants.

32.     Defendant Merrill Lynch, Pierce, Fenner & Smith Inc. ("Merrill Lynch") was a joint lead underwriter of the Company's IPO.  Merrill Lynch  is a global financial services firm that provides capital markets services, investment banking and advisory services, wealth management, asset management, insurance, banking and related products and services.

33.     Defendant Morgan Stanley & Co., Inc. ("Morgan Stanley") was a joint lead underwriter of the Company's IPO.  Morgan Stanley is a global financial services firm that provides financial products and services, including strategic advisory services for mergers, acquisition, and other financial transactions, to corporations, governments, financial institutions, individuals and other customers.

34.     Defendant Cowen & Co. ("Cowen") was a co-manager of the Company's IPO.  Cowen offers financial services, including research, investment banking services, financial advisory services, and transactional advice to its customers.

35.    Defendant Jefferies & Co. ("Jefferies") was a co-manager of the Company's IPO. Jefferies is a global investment bank and institutional securities firm that provides financial services to middle-market companies and their investors.

36.    Defendant ThinkEquity Partners, LLC ("ThinkEquity") was a co-manager of the Company's IPO.  ThinkEquity is institutional investment firm focused on research services to growth sectors of the economy.

37.    Defendants Merrill Lynch, Morgan Stanley, Cowen, Jefferies, and ThinkEquity are collectively referred to hereinafter as the "Underwriter Defendants." In addition to underwriting the Company's IPO, the Underwriter Defendants also served as financial advisors and assisted in the preparation of BigBand's IPO materials.

## CLASS ACTION ALLEGATIONS

38.    Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure ("FRCP") 23(a) and 23(b)(3) individually and on behalf of all those who purchased or otherwise acquired BigBand common stock during the Class Period, which stock was purchased and/or acquired pursuant and/or traceable to the Company's Offering Documents for its March 14, 2007 IPO, including those who purchased or otherwise acquired the Company's common stock during the Class Period, and who were damaged thereby (the "Class").  Excluded from the Class are Defendants herein, members of the Individual Defendants' immediate families, and any person, firm, trust, corporation, officer, director or other individual or entity in which any Defendant has a controlling interest or which is related to or affiliated with any of the Defendants, and the legal representatives, agents, affiliates, heirs, successors-in-interest or assigns of any such excluded party.

39.    The members of the Class are so numerous that joinder of all members is impracticable.  BigBand's common stock was actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by BigBand or its transfer agent, and may be notified of the

pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

40.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

41.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

42.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

a.    whether the federal securities laws were violated by Defendants' acts as alleged herein;

b.    whether statements made by Defendants to the investing public in the Offering Documents misrepresented material facts about the business, operations and management of BigBand; and

c.    to what extent the members of the Class have sustained damages and the proper measure of damages.

43.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

### Background

44.    BigBand develops, markets, and sells network-based platforms that enable cable operators and telephone companies to offer video, voice, and data services across coaxial, fiber, and copper networks.  The Company's product applications enable service providers to deliver

high-quality video, voice, and data services, as well as offer video advertising. The Company's product applications include Digital Simulcast, which enables service providers to create a digital version of analog inputs and deliver analog and digital video streams to subscribers; TelcoTV, used to provide high-quality viewing experience; Switched Broadcast, which enables service providers to transmit video channels to subscribers; and High-Speed Data and Voice-over-IP, which enables cable operators to offer real-time services, such as VoIP and streaming video content over the Internet. BigBand's primary hardware and management software platforms include Broadband Multimedia-Service Router, used for real-time processing and switching of video; Broadband Multimedia-Service Edge, used to communicate directly with subscriber set-top boxes and cable modems; and BigBand FastFlow Broadband Provisioning Manager, a network-based software suite for providing high-speed data and voice services to cable modems.

45.     The Company has customers in cable, telecommunications, satellite, and terrestrial broadcasting worldwide. BigBand offers its products and services in the United States through its direct sales force, as well as through a combination of direct sales, distributors, and independent resellers internationally. The Company was founded in 1998 and is headquartered in Redwood City, California, with additional offices in Westborough, Massachusetts; Tel Aviv, Israel; Slough, England; Dusseldorf and Rosenheim, Germany; Hong Kong, Shanghai, and Beijing, the People's Republic of China; Seoul, South Korea; Tokyo, Japan; and Merignac, France.

**False and Misleading Offering Documents**

46.     On or about March 8, 2007, BigBand filed a Form S-1/A IPO Registration Statement with the SEC. Thereafter, on or about March 15, 2007, and with an effective date of March 14, 2007, the Company filed its IPO Prospectus with the SEC (the IPO Registration Statement and the IPO Prospectus are collectively referred to herein as the "Offering Documents").

47.     The Company's Offering Documents were materially false and misleading and omitted information necessary to make such statements not misleading. In addition, the Offering

Documents were not prepared in accordance with the rules and regulations governing the preparation of such documents.

48.    The Offering Documents provided materially false and misleading information regarding the Company, its business and its future prospects in the marketplace:

We develop, market and sell network-based platforms that enable cable operators and telephone companies, collectively called service providers, to offer video, voice and data services across coaxial, fiber and copper networks. We have significant expertise in rich media processing, communications networking and bandwidth management. We have delivered what we believe to be the only successful commercial deployments of switched broadcast, an application that substantially increases the volume of content that a service provider can offer. In addition, we were the first to implement what we believe has become the industry's de facto network architecture for digital simulcast, an application that facilitates the insertion of advertising and the transmission of video in a digital format across a network while still providing service to analog subscribers. Our product applications of Digital Simulcast, TelcoTV, Switched Broadcast, and High-Speed Data and Voice-over-IP are a combination of our modular software and programmable video and data hardware platforms.

Our software and hardware product applications are used by leading service providers worldwide to offer video, voice and data services to tens of millions of subscribers, 24 hours a day, seven days a week. We have sold our product applications to more than 100 customers globally, including Cablevision, Charter, Comcast, Cox, Time Warner Cable and Verizon, which are six of the ten largest service providers in the United States. Our net revenues increased 80.3% to $176.6 million for the year ended December 31, 2006 from $98.0 million in 2005. We have been profitable on a quarterly basis since the three months ended September 30, 2006, and we first achieved profitability on an annual basis in 2006.

Intelligent, High-Bandwidth Video Networks Are Needed

Service providers derive most of their revenue from consumer subscriptions and advertising. Service providers are increasingly bundling disparate video, voice and data services into integrated offerings, also known as "triple-play" services. Video is the most technically demanding, provides the richest user experience and currently offers the greatest revenue per subscriber of the triple-play services. As of December 2006, Yankee Group Research estimates that, on average, consumers spend $68 per month for digital video services compared to $47 for voice and $33 for data services.

Competition to deliver video, voice and data services has fueled recurring cycles of network investment as service providers seek to capture increasing revenues by offering additional services. Regulatory, technological and competitive factors are leading service providers to increasingly compete against one another for consumer subscription and advertising revenues. For example, cable operators have added approximately eight million voice-over-IP subscribers, while telephone companies are investing in video, such as Verizon's announced plan to upgrade its fiber-optic network for video and data services at a cost of $18 billion. In addition to competing among themselves, service providers are facing competition from Internet and media companies, such as ABC.com, Apple

-10-

Computer, Google and Yahoo, which use the Internet to deliver video content and advertising directly to consumers.

To differentiate their video, voice and data services from the competition, service providers are beginning to develop differentiated video offerings that more directly respond to consumer demand for more personalized and richer content, a higher quality experience and greater ease of access to this content. For example, subscribers are demanding more high definition television, or HDTV, and gaining more control over their consumption of video content through video-on-demand, or VOD, technologies. At the same time, advertisers are increasingly demanding that video-based advertising deliver more relevant ads with the interactivity to measure return on ad spending comparable to ads placed on the Internet. The need to respond to consumer demands for richer, more accessible and more relevant content, and advertisers' demands for increased interactivity, is forcing service providers to improve their networks.

Current service provider networks are not well suited to deliver the entire triple-play bundle of services and relevant advertising. In particular, these networks lack sufficient bandwidth necessary to deliver rich video services such as HD programming and lack the interactivity and ability to tailor programming and advertising to subscribers. As a result, a simple expansion of network capacity is not likely to meet these challenges, and there is a need for platforms designed primarily for reliable and cost-effective video delivery, which in turn will enable the entire triple-play offering. The rapidly changing trends in consumer demands and advertiser requirements, coupled with the competitive environment, are forcing service providers to develop more intelligent, extensible networks to provide these advanced services, enable increasingly relevant advertising and make more efficient use of available network capacity.

The BigBand Solution

The limitations of existing networks pose significant challenges to service providers. The BigBand solution addresses these challenges by enabling service providers to deliver high-quality video, voice and data services and more effective video advertising.

- *Intelligent Bandwidth Management.* The growing volume and richness of video content being demanded by subscribers, such as HDTV, is straining the capacity of existing fixed-bandwidth networks. Our media processing capabilities significantly increase the capacity of these networks without a costly capital expansion.

- *High-Quality Video Experience.* Video is less tolerant of the delays and errors that degrade the quality of the viewing experience. Our product applications enhance video quality in the network by correcting errors before subscribers are impacted.

- *Enhanced Video Personalization.* Networks lack the intelligence to understand and react to subscriber television viewing behavior. Using our product applications, service providers interact with their subscribers down to the individual channel change and, as a result, can more accurately tailor programming packages to the interests of their subscribers.

- *Ability to Deliver Relevant Video Advertising.* Existing networks provide only limited ability to deliver more relevant ads to audiences.

Our products allow service providers to insert advertising tailored to specific geographic zones.

- *Optimize Return on Existing Infrastructure Investment.* Service providers have spent billions to build and maintain their networks and want to extend the useful life of their infrastructure investments. Our network-based products allow service providers to manage service quality and upgrade their voice, video and data offerings from the network, avoiding costly upgrades and installations of customer premise equipment, or CPE.

- *Platform Flexibility.* Networks must have the flexibility to rapidly deploy new services, such as HDTV, VOD and voice-over-IP, or VoIP. Our fully programmable hardware and modular software architecture is field-upgradable and designed to meet service provider requirements for network flexibility.

Competitive Strengths of BigBand

We have core expertise in media processing, communications networking and bandwidth management. We hold 26 U.S. patents, 16 of which relate to our video products and ten of which relate to our data products. Our expertise in emerging technologies, such as switched broadcast, and our customer relationships with large service providers are key strengths that enable us to gain greater insight into the network requirements of our customers. Leveraging this expertise, we combine our fully programmable hardware and modular software architecture to deliver product applications designed to meet service provider needs for intelligent, high-bandwidth networks. Our products are interoperable with a broad range of content and services in various parts of a service provider's network. Further, we believe our product applications decrease our customers' total cost of ownership, reduce their time-to-market with new services and improve their ability to achieve more efficient bandwidth utilization.

49.    Pursuant to the Company's IPO, BigBand and certain selling shareholders, sold approximately 12.3 million shares of BigBand stock at a per-share price of $13.00, reaping approximately $148.8 million in net proceeds.

50.    The IPO included sales by certain of the Individual Defendants who sold their shares of BigBand stock, including shares sold as part of over-allotment, at a per-share price of $13.00, reaping over $16.4 million in gross proceeds:

| DEFENDANT | SHARES | AMOUNT |
|-----------|--------|--------|
| Bassan-Eskenazi | 400,058 | $5,200,754 |
| Oz | 400,000 | $5,200,000 |
| Gilbert | 20,109 | $261,417 |
| Israely | 446,229 | $5,800,977 |
| **TOTAL** | **1,266,396** | **$16,463,148** |

-12-

51.    After the close of the IPO, and because of the Company's materially misleading statements and omissions in the Offering Documents, BigBand's stock reached a high of $21.43 per share on May 3, 2007.

**False and Misleading Statements After the IPO**

52.    On August 2, 2007, BigBand issued a press release announcing financial results for the second quarter 2007. The press release stated as follows:

BigBand Networks, Inc., (NASDAQ:BBND), a leading provider of broadband multimedia infrastructure for video, voice and data, today announced financial results for the three and six months ended June 30, 2007.

For the second quarter of 2007, BigBand Networks reported net revenues of $54.5 million, an increase of 43% over the second quarter of 2006. GAAP net income for the quarter was $1.7 million, or $0.02 per diluted share, compared to a net loss of $0.6 million, or ($0.05) per share reported in the second quarter of 2006. Gross margin improved to 53.4% on a GAAP basis from a gross margin of 48.7% in the second quarter of 2006. Operating income increased to $42,000 on a GAAP basis during the second quarter of 2007 from an operating loss of $0.4 million in the second quarter of 2006. GAAP results for the second quarter of 2007 includes $2.9 million in stock-based compensation expense and $0.1 million in amortization of intangibles. In the second quarter of 2006, we incurred $0.5 million in stock-based compensation expense, $0.1 million in amortization of intangibles and $57,000 in preferred stock warrant expense. A reconciliation of our GAAP and non-GAAP results is included as part of this release.

Excluding the above-mentioned charges, net of tax, non-GAAP results for the second quarter of 2007 includes net income of $4.7 million, or $0.07 per diluted share, compared to a net loss of $22,000, or $0.00 per diluted share, reported in the second quarter of 2006. Gross margin improved to 54.2% during the second quarter of 2007 from 48.9% in the second quarter of 2006. Operating income increased to $3.1 million during the second quarter of 2007 from $0.3 million in the second quarter of 2006.

"We are pleased with our improvements in both revenues and earnings results in the second quarter," commented Amir Bassan-Eskenazi, president and CEO of BigBand Networks. "We continued to drive significant expansion of the footprint of our media services platforms. We continue to work closely with customers in supporting their efforts to enhance their existing networks for advanced video services. We believe that BigBand's solutions for switched broadcast and TelcoTV will continue to gain traction with major customers both in the U.S. and internationally.

For the first six months of 2007, BigBand Networks reported net revenues of $107.3 million, an increase of 52% over the first half of 2006. GAAP results for the six months period of 2007 includes net income of $0.7 million, or $0.01 per diluted share, compared to a net loss of $1.6 million, or ($0.15) per diluted share reported in the six months period of 2006. Gross margin improved to 55.4% in the first half of 2007 from 49.8% in the first half of 2006. Operating income increased to $3.4 million during the first half of 2007 from an operating loss of $1.5 million in the first half of 2006. GAAP net income for the first half of 2007 includes non-cash charges of $5.0 million in preferred stock warrant expense, $5.4 million in

stock-based compensation expense, and $0.3 million in amortization of intangibles. This compares to non-cash charges of $0.2 million in preferred stock warrant expense, $0.8 million in stock-based compensation expense and $0.3 million in amortization of intangibles for the first half of 2006.

Excluding the above-mentioned charges, net of tax, non-GAAP results include net income for the first half of 2007 of $10.5 million, or $0.16 per diluted share. This compares to a net loss of $0.7 million, or ($0.06) per diluted share, reported in the first half of 2006. Gross margin improved to 56.1% during the first half of 2007 from a gross margin of 50.0% in the first half of 2006. Operating income increased to $9.0 million during the first half of 2007 from an operating loss of $0.4 million in the first half of 2006.

"Video continues to be a major driver of capital expenditures in service provider networks. We believe that our technology innovation and time-to-market leadership are key competitive differentiators in our video and data markets. Our product roadmap calls for more innovation as the industry moves to addressable advertising and personalized video services. We continue to be well-positioned for additional growth over the long-term and are optimistic about our business," concluded Bassan-Eskenazi.

Business Outlook

Based on current expectations, management provided the following outlook for its business in the third quarter of 2007:

Quarter Ending September 30, 2007

- Net revenues are anticipated to be in the range of approximately $54 to $58 million.
- GAAP gross margins are anticipated to be in the range of 53% to 55%, which includes approximately $0.4 million in stock-based compensation.
- GAAP operating expenses are anticipated to be in the range of $30 to $31 million, which includes approximately $3.0 million in stock-based compensation and amortization of intangibles.
- Provision for income tax is anticipated to be in the range of approximately $0.5 to $0.6 million.
- Fully diluted weighted average shares are anticipated to be in the range of 71 to 72 million shares.
- This equates to GAAP earnings (loss) per share in the range of ($0.01) to $0.03, and a non-GAAP earnings per share in the range of $0.03 to $0.07.

Fiscal Year Ending December 31, 2007

- Net revenues are anticipated to be in the range of approximately $225 to $230 million.
- GAAP gross margins are anticipated to be in the range of 54% to 56%, which includes approximately $1.5 million in stock-based compensation.
- GAAP operating expenses are anticipated to be in the range of $116 to $121 million, which includes stock-based compensation of approximately $10.5 million and amortization of intangibles of $0.6 million.
- Provision for income tax is anticipated to be in the range of approximately $2.0 to $2.5 million.
- Fully diluted weighted average shares are anticipated to be in the range of 69 to 70 million shares.

- This equates to GAAP earnings per share in the range of $0.03 to $0.08, and a non-GAAP earnings per share in the range of $0.28 to $0.33.

53.    The market reacted quickly to the Company's disappointing second quarter financial results as BigBand's stock price plunged 28%, or $3.88 per share, in one day from $13.98 on August 2, 2007 to a close of $10.10 on August 3, 2007.

54.    In an article reporting on the Company's financial results, *Bloomberg* stated that while BigBand said it expects to earn 6 cents to 11 cents a share in 2007, "[f]our analysts surveyed by Bloomberg had anticipated profit of 26 cents, on average" for the Company.

55.    In addition, the disappointing announcement led to questioning from analysts and financial reporters over the price and timing of the IPO, including concerns that the IPO was floated too soon, that the Company was not mature enough for the IPO, and that the IPO price of $13.00 per share was too high.

**The Truth is Revealed**

56.    On September 27, 2007, BigBand issued a press release announcing a revised revenue outlook for the third quarter of 2007.  The press release stated as follows:

BigBand Networks, Inc., (NASDAQ:BBND) today revised its revenue outlook for the third quarter ending September 30, 2007. The Company now expects to report revenue for the third quarter in the range of $35 to $39 million, which is below the Company's previous guidance of $54 to $58 million.

The lower revenue outlook is due to several coincident factors. BigBand has been deploying switched digital video across an expanding number of customers and configurations. Some of these ongoing deployments have required more software customization and integration than originally expected. This impacted the Company's ability to recognize switched digital revenue for some deployments in the third quarter. The Company also experienced slowdown in Telco-TV revenue, as its major customer worked through some previously purchased inventory. Finally, the Company experienced continued softness in its data business. As a result of lower revenue expectations, BigBand expects to report an operating loss for the third quarter of fiscal year 2007.

"While we believe the market for our video solutions continues to be strong and are confident in our roadmap for the long term, we are clearly disappointed in our execution this quarter," said Amir Bassan-Eskenazi, BigBand's chief executive officer. "We are aggressively addressing these issues and will provide more specifics in our announcement of third quarter financial results in early November."

57.     Following this announcement, the Company's stock price plummeted 29% in one day to $6.40 per share on September 28, 2007 – the lowest price for BigBand's shares since the Company went public in March.

58.     In an article commenting on BigBand's revised revenue outlook for the third quarter of 2007, *Bloomberg* reported that "[a]t least three analysts cut their rating on [BigBand's] stock."

59.     Thereafter, on October 30, 2007, BigBand issued a press release announcing third quarter financial results and the details of a restructuring plan for the Company, including the retirement of the Cuda CMTS Platform.  The press release stated as follows:

> BigBand Networks, Inc., (NASDAQ:BBND) today announced financial results for the three and nine months ended September 30, 2007.
>
> Revenues for the third quarter of 2007 were $38.5 million, a decrease of 10% from the third quarter of 2006. GAAP net loss for the third quarter of 2007 was $12.2 million, or $(0.21) per diluted share compared to GAAP net income of $1.6 million, or $0.03 per diluted share, in the third quarter of 2006. GAAP gross margins for the third quarter of 2007 were 36% compared to 52% in the third quarter of 2006. In the third quarter of 2007, the Company's GAAP operating loss was $12.9 million, compared to an operating profit of $2.9 million in the third quarter of 2006.
>
> GAAP results for the third quarter of 2007 include $3.2 million in stock-based compensation expense, $143,000 in amortization of intangibles, and $5.8 million in fixed assets and inventory charges associated with the retirement of the Cuda CMTS platform. In the third quarter of 2006, the Company incurred $0.6 million in stock-based compensation expense, $143,000 in amortization of intangibles and $1.2 million in preferred stock warrant expense. Non-GAAP results exclude such elements. A reconciliation of GAAP and non-GAAP results is included as part of this release as well as on the investor relations section of the Company's website.
>
> On a non-GAAP basis, the Company had a net loss of $2.7 million, or $0.05 per diluted share, in the third quarter of 2007, compared to net income of $3.5 million, or $0.06 per diluted share in the third quarter of 2006. Non-GAAP gross margins were 51.1% for the third quarter of 2007 compared to 52.0% in the third quarter of 2006. Non-GAAP operating loss for the third quarter of 2007 was $3.8 million as compared to a profit of $3.6 million in the third quarter of 2006.
>
> In addition, BigBand announced a restructuring plan designed to realign resources and significantly increase its efforts on video networking. As part of this plan, the Company will reduce its workforce by 15% and retire its Cuda CMTS platform.
> As part of the Company's restructuring efforts, David Heard has been appointed chief operating officer. Heard was previously general manager of product operations and will now assume combined responsibility for research & development, marketing, sales, services and operations. Heard joined BigBand earlier in 2007, bringing with him experience in leadership positions at a number

of data and telecom companies, including Tekelec, Lucent, AT&T and Somera Communications.

"Since our revised guidance announcement, we have re-evaluated our business, reviewed our market opportunities and conferred with our customers," commented Amir Bassan-Eskenazi, president and CEO of BigBand Networks. "We have decided to focus on our unique core competency -- video -- and no longer commit resources to the Cuda CMTS platform. In addition, we will reduce our workforce across the company to more closely align spending with near-term revenue opportunities. While our current operating challenges will take some time to work through, we expect to emerge from the next few quarters as a stronger, more focused company."

Concluded Bassan-Eskenazi, "We believe that switched digital video, edge QAM and Telco TV offer BigBand a significant opportunity for growth over the coming years and that addressable advertising and IPTV will create additional opportunities. We continue to be selected for a broad range of switched digital video deployments by major MSO customers. In the third quarter, two additional MSOs selected us for SDV deployments. These recent wins, as well as our long-term TelcoTV opportunities, give us confidence about our long-term growth prospects."

Business Outlook

Based on current expectations, management provided the following outlook for its business in the fourth quarter of 2007:

- Net revenues are anticipated to be in the range of approximately $27 to $33 million.

- GAAP gross margins are anticipated to be in the range of 45% to 48%, which includes approximately $0.4 million in stock-based compensation.

- GAAP operating expenses are anticipated to be in the range of $25.5 to 26.5 million, which includes approximately $2.5 million in stock-based compensation, $143,000 in amortization of intangibles and approximately $0.8 million in litigation-related expenses.

- Additionally, we expect to incur one-time charges associated with the restructuring of our business in the range of $3 to 5 million, which includes employee severance and lease termination costs.
- GAAP provision for income tax is anticipated to be in the range of approximately $0.5 to $0.7 million, and non-GAAP provision for income tax is anticipated to be in the range of approximately $0.2 to $0.4 million.

- Fully diluted weighted average shares are anticipated to be in the range of 58 to 60 million shares.

- This equates to GAAP loss per share in the range of $0.31 to $0.22 and a non-GAAP loss per share in the range of $0.18 to $0.12.

60.    BigBand's stock again declined precipitously following this announcement as the Company's shares fell 9.9% to $6.00 – the largest single-day stock price decline for BigBand since the Company's September 27, 2007 press release announcing its revised revenue outlook.

61.    In an article reporting on the announcement, *Bloomberg* reported that while the Company forecasts a fourth-quarter loss excluding some items of 12 to 18 cents a share, the analysts "polled by Bloomberg estimated a loss of 10 cents on average."

62.    The Offering Documents and the Company's statements after the Offering were materially false and misleading because they failed to disclose or indicate the following material information concerning the Company's business and future prospects:

a.    that the Company's SDV products suffered from interoperability issues with regard to certain video infrastructure systems;

b.    that the integration of the Company's SDV products required significant software customization and integration;

c.    that growth of the Company's SDV products and sales was stagnant;

d.    that, as a result of the above, the Company would be forced to recognize the revenue associated with its SDV product sales over an extended period of time;

e.    that the Company had shipped excess amounts of TelcoTV inventory to customers such as Verizon, which reduced future demand for these products;

f.    that the continued viability of the Company's Cuda CMTS business was in doubt due to increased competition from competitors who had greater resources and better positioning to capture the marketplace; and

g.    that the Company lacked adequate internal and financial controls.

**UNDISCLOSED ADVERSE FACTS**

63.    The market for BigBand's common stock was open, well-developed and efficient at all relevant times. As a result of these materially false and misleading statements and failures to disclose, BigBand's common stock traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired BigBand's

1  common stock relying upon the integrity of the market price of BigBand's common stock and

2  market information relating to BigBand, and have been damaged thereby.

3      64.    During the Class Period, Defendants materially misled the investing public,

4  thereby inflating the price of BigBand's common stock, by publicly issuing false and misleading

5  statements and omitting to disclose material facts necessary to make Defendants' statements, as

6  set forth herein, not false and misleading.  Said statements and omissions were materially false

7  and misleading in that they failed to disclose material adverse information and misrepresented

8  the truth about the Company, its business and operations, as alleged herein.

9      65.    At all relevant times, the material misrepresentations and omissions particularized

10 in this Complaint directly or proximately caused or were a substantial contributing cause of the

11 damages sustained by Plaintiff and other members of the Class.  As described herein, during the

12 Class Period, Defendants made or caused to be made a series of materially false or misleading

13 statements about BigBand's financial well-being, business relationships, and prospects.  These

14 material misstatements and omissions had the cause and effect of creating in the market an

15 unrealistically positive assessment of BigBand and its financial well-being, business

16 relationships, and prospects, thus causing the Company's common stock to be overvalued and

17 artificially inflated at all relevant times.  Defendants' materially false and misleading statements

18 during the Class Period resulted in Plaintiff and other members of the Class purchasing the

19 Company's common stock at artificially inflated prices, thus causing the damages complained of

20 herein.

21                        **SCIENTER ALLEGATIONS**

22     66.    As alleged herein, Defendants acted with scienter in that Defendants knew that

23 the public documents and statements issued or disseminated in the name of the Company were

24 materially false and misleading; knew that such statements or documents would be issued or

25 disseminated to the investing public; and knowingly and substantially participated or acquiesced

26 in the issuance or dissemination of such statements or documents as primary violations of the

27 federal securities laws.  As set forth elsewhere herein in detail, Defendants, by virtue of their

28 receipt of information reflecting the true facts regarding BigBand, their control over, and/or

1  receipt and/or modification of BigBand's allegedly materially misleading misstatements and/or

2  their associations with the Company which made them privy to confidential proprietary

3  information concerning BigBand, participated in the fraudulent scheme alleged herein.

4  **LOSS CAUSATION**

5      67.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused

6  the economic loss suffered by Plaintiff and the Class.

7      68.     During the Class Period, Plaintiff and the Class purchased common stock of

8  BigBand at artificially inflated prices and were damaged thereby. The price of BigBand's

9  common stock significantly declined when the misrepresentations made to the market, and/or the

10  information alleged herein to have been concealed from the market, and/or the effects thereof,

11  were revealed, causing investors' losses.

12      69.     The decline in the price of BigBand's common stock after the truth came to light

13  was a direct result of the nature and extent of Defendants' fraud finally being revealed to

14  investors and the market. The timing and magnitude of BigBand's common stock price decline

15  negates any inference that the loss suffered by Plaintiff and the other Class members was caused

16  by changed market conditions, macroeconomic or industry factors or Company-specific facts

17  unrelated to the Defendants' fraudulent conduct. The economic loss suffered by Plaintiff and the

18  other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate

19  the prices of BigBand's securities and the subsequent decline in the value of BigBand's

20  securities when Defendants' prior misrepresentations and other fraudulent conduct were

21  revealed.

22  **APPLICABILITY OF PRESUMPTION OF RELIANCE:**

23  **FRAUD ON THE MARKET DOCTRINE**

24      70.     At all relevant times, the market for BigBand stock was an efficient market for the

25  following reasons, among others:

26      a.     BigBand stock met the requirements for listing, and was listed and

27  actively traded, on the NASDAQ, a highly efficient market;

28

1      b.      As a regulated issuer, BigBand filed periodic public reports with the SEC

2  and the NASDAQ;

3      c.      BigBand stock was followed by securities analysts employed by major

4  brokerage firms who wrote reports which were distributed to the sales force and certain

5  customers of their respective brokerage firms.  Each of these reports was publicly available and

6  entered the public marketplace; and

7      d.      BigBand regularly issued press releases which were carried by national

8  newswires.  Each of these releases was publicly available and entered the public marketplace.

9      71.      As a result, the market for BigBand securities promptly digested current

10  information with respect to the Company from all publicly-available sources and reflected such

11  information in BigBand's stock price.  Under these circumstances, all purchasers of BigBand

12  securities during the Class Period suffered similar injury through their purchase of stock at

13  artificially inflated prices and a presumption of reliance applies.

14                          **NO SAFE HARBOR**

15      72.      The statutory safe harbor provided for forward-looking statements under certain

16  circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.

17  Many of the specific statements pleaded herein were not identified as "forward-looking

18  statements" when made.  To the extent there were any forward-looking statements, there were no

19  meaningful cautionary statements identifying important factors that could cause actual results to

20  differ materially from those in the purportedly forward-looking statements.  Alternatively, to the

21  extent that the statutory safe harbor does apply to any forward-looking statements pleaded

22  herein, Defendants are liable for those false forward-looking statements because at the time each

23  of those forward-looking statements was made, the particular speaker knew that the particular

24  forward-looking statement was false, and/or the forward-looking statement was authorized

25  and/or approved by an executive officer of BigBand who knew that those statements were false

26  when made.

27                          **COUNT I**
**Violation of Section 11 of the Securities Act**
28                      **(Against All Defendants)**

73.     Plaintiff repeats and realleges the allegations set forth above as if set forth fully herein.

74.     This Claim is brought pursuant to §11 of the Securities Act, 15 U.S.C. §77k, on behalf of Plaintiff and other members of the Class who purchased or otherwise acquired the BigBand's stock pursuant to and/or traceable to the Company's IPO, against BigBand, the Individual Defendants, and the Underwriter Defendants, and were damaged thereby.

75.     As set forth above, the Offering Documents, when they became effective, contained untrue statements of material fact and omitted to state material facts required to be stated therein or necessary to make the statements therein not misleading.

76.     BigBand is the registrant for the IPO. The Company issued, caused to be issued and participated in the issuance of materially false and misleading written statements and/or omissions of material facts to the investing public that were contained in the Offering Documents as set forth herein.

77.     As issuer of the shares, BigBand is strictly liable to Plaintiff and the Class for the misstatements and omissions contained or excluded from the Offering Documents.

78.     The Individual Defendants, either personally or through an attorney-in-fact, signed the Offering Documents and/or were Directors or persons performing similar functions for the Company at the time of the IPO.

79.     The Underwriter Defendants are liable as underwriters in connection with the IPO.

80.     By reason of the conduct alleged herein, each Defendant violated, and/or controlled a person who violated, §11 of the Securities Act. As such, each Defendant named in this Claim is liable to Plaintiff and other members of the Class who purchased or otherwise acquired shares of the Company pursuant and/or traceable to the IPO.

81.     Plaintiff acquired BigBand shares pursuant and/or traceable to the Offering Documents for the Company's IPO.

82.    By virtue of the foregoing, Plaintiff and other members of the Class who purchased or otherwise acquired the Company's stock pursuant to and/or traceable to the IPO are entitled to damages pursuant to §11.

83.    This Claim was brought within one year after discovery of the untrue statements and omissions in the Offering Documents, or after such discovery should have been made by the exercise of reasonable diligence, and within three years after the Company's stock was first bona fide offered to the public.

84.    None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Offering Documents were true and without omissions of any material facts and were not materially misleading.

85.    At the time of their purchases of BigBand's stock, Plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts.

**COUNT II**
**Violation of Section 12(a)(2) of the Securities Act**
**(Against All Defendants)**

86.    Plaintiff repeats and realleges the allegations set forth above as if set forth fully herein.

87.    This Count is brought pursuant to §12(a)(2) of the Securities Act on behalf of the Class and against all Defendants.

88.    Defendants were sellers, offerors, and/or solicitors of purchasers of the shares offered pursuant to the BigBand Offering Documents.

89.    The Offering Documents contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and concealed and failed to disclose material facts.    The Individual Defendants' actions of solicitation included participating in the preparation of the false the misleading Offering Documents.

90.    Defendants owed to the purchasers of BigBand's common stock, including Plaintiff and other members of the Class, the duty to make a reasonable and diligent investigation

of the statements contained in the Offering Documents to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading. Defendants knew of, or in the exercise of reasonable care should have known of, the misstatements and omissions contained in the Offering Documents, as set forth above.

91. Plaintiff and other members of the Class purchased or otherwise acquired BigBand's common stock pursuant to and/or traceable to the defective Offering Documents. Plaintiff did not know, or in the exercise of reasonable diligence could not have known, of the untruths and omissions contained in the Offering Documents.

92. Plaintiff, individually and representatively, hereby offers to tender to Defendants that common stock which Plaintiff and other Class members continue to own, on behalf of all members of the Class who continue to own such common stock, in return for the consideration paid for that common stock together with interest thereon. Class members who have sold their BigBand common stock are entitled to rescissory damages.

93. By reason of the conduct alleged herein, these Defendants violated, and/or controlled a person who violated §12(a)(2) of the Securities Act. Accordingly, Plaintiff and members of the Class who hold BigBand common stock purchased in the Offering have the right to rescind and recover the consideration paid for their BigBand common stock, and hereby elect to rescind and tender their BigBand common stock to the Defendants sued herein. Plaintiff and Class members who have sold their BigBand common stock are entitled to rescissory damages.

94. This action is brought within three years from the time that the common stock upon which this Count is brought was sold to the public, and within one year from the time when Plaintiff discovered or reasonably could have discovered the facts upon which this Count is based.

## COUNT III
### Violation of Section 15 of the Securities Act
### (Against the Individual Defendants)

95. Plaintiff repeats and realleges the allegations set forth above as if set forth fully herein.

96.    This Claim is brought against the Individual Defendants pursuant to §15 of the Securities Act, 15 U.S.C. § 77o, on behalf of Plaintiff and other members of the Class who purchased or otherwise acquired BigBand's stock pursuant and/or traceable to the Company's IPO.

97.    The Company is liable under §11 of the Securities Act as set forth in Count I herein with respect to the IPO.

98.    Each of the Individual Defendants was a control person of the Company with respect to the IPO by virtue of that individual's position as a senior executive officer and/or director of the Company.

99.    The Individual Defendants, by virtue of their managerial and/or board positions with the Company, controlled the Company as well as the contents of the Offering Documents at the time of the IPO.  Each of the Individual Defendants was provided with or had unlimited access to copies of the Offering Documents and had the ability to either prevent their issuance or cause them to be corrected.

100.    As a result, the Individual Defendants are liable under §15 of the Securities Act for the Company's primary violation of §11 of the Securities Act.

101.    By virtue of the foregoing, Plaintiff and other members of the Class who purchased or otherwise acquired the Company's stock pursuant and/or traceable to the IPO are entitled to damages against the Individual Defendants.

**COUNT IV**
**Violation of Section 10(b) of the Exchange Act and**
**Rule 10b-5 Promulgated Thereunder**
**(Against All Defendants)**

102.    Plaintiff repeats and realleges the allegations set forth above as though fully set forth herein.  This claim is asserted against all Defendants.

103.    During the Class Period, BigBand and the Individual Defendants, and each of them, carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of BigBand

common stock; and (iii) cause Plaintiff and other members of the Class to purchase BigBand stock at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants BigBand and the Individual Defendants, and each of them, took the actions set forth herein.

104. These Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for BigBand securities in violation of §10(b) of the Exchange Act and Rule 10b-5. Defendants are sued as primary participants in the wrongful and illegal conduct charged herein. The Individual Defendants are also sued herein as controlling persons of BigBand, as alleged herein.

105. In addition to the duties of full disclosure imposed on Defendants as a result of their making of affirmative statements and reports, or participation in the making of affirmative statements and reports to the investing public, they each had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulation S X (17 C.F.R. § 210.01 et seq.) and S-K (17 C.F.R. § 229.10 et seq.) and other SEC regulations, including accurate and truthful information with respect to the Company's operations, financial condition and performance so that the market prices of the Company's publicly traded securities would be based on truthful, complete and accurate information.

106. BigBand and the Individual Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, business practices, performance, operations and future prospects of BigBand as specified herein. These Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of BigBand's

1   value and performance and substantial growth, which included the making of, or the

2   participation in the making of, untrue statements of material facts and omitting to state material

3   facts necessary in order to make the statements made about BigBand and its business, operations

4   and future prospects in the light of the circumstances under which they were made, not

5   misleading, as set forth more particularly herein, and engaged in transactions, practices and a

6   course of business which operated as a fraud and deceit upon the purchasers of BigBand's

7   securities during the Class Period.

8       107.   Each of the Individual Defendants' primary liability, and controlling person

9   liability, arises from the following facts: (i) each of the Individual Defendants was a high-level

10  executive and/or director at the Company during the Class Period; (ii) each of the Individual

11  Defendants, by virtue of his responsibilities and activities as a senior executive officer and/or

12  director of the Company, was privy to and participated in the creation, development and

13  reporting of the Company's operational and financial projections and/or reports; (iii) the

14  Individual Defendants enjoyed significant personal contact and familiarity with each other and

15  were advised of and had access to other members of the Company's management team, internal

16  reports, and other data and information about the Company's financial condition and

17  performance at all relevant times; and (iv) the Individual Defendants were aware of the

18  Company's dissemination of information to the investing public which they knew or recklessly

19  disregarded was materially false and misleading.

20      108.   These Defendants had actual knowledge of the misrepresentations and omissions

21  of material facts set forth herein, or acted with reckless disregard for the truth in that they failed

22  to ascertain and to disclose such facts, even though such facts were readily available to them.

23  Such Defendants' material misrepresentations and/or omissions were done knowingly or

24  recklessly and for the purpose and effect of concealing BigBand's operating condition, business

25  practices and future business prospects from the investing public and supporting the artificially

26  inflated price of its stock.  As demonstrated by their overstatements and misstatements of the

27  Company's financial condition and performance throughout the Class Period, the Individual

28  Defendants, if they did not have actual knowledge of the misrepresentations and omissions

1    alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking

2    those steps necessary to discover whether those statements were false or misleading.

3        109.    As a result of the dissemination of the materially false and misleading information

4    and failure to disclose material facts, as set forth above, the market price of BigBand securities

5    was artificially inflated during the Class Period.  In ignorance of the fact that the market price of

6    BigBand shares was artificially inflated, and relying directly or indirectly on the false and

7    misleading statements made by Defendants, or upon the integrity of the market in which the

8    securities trade, and/or on the absence of material adverse information that was known to or

9    recklessly disregarded by Defendants but not disclosed in public statements by Defendants

10   during the Class Period, Plaintiff and the other members of the Class acquired BigBand

11   securities during the Class Period at artificially inflated high prices and were damaged thereby.

12       110.    At the time of said misrepresentations and omissions, Plaintiff and other members

13   of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the

14   other members of the Class and the marketplace known of the true performance, business

15   practices, future prospects and intrinsic value of BigBand, which were not disclosed by

16   Defendants, Plaintiff and other members of the Class would not have purchased or otherwise

17   acquired BigBand securities during the Class Period, or, if they had acquired such securities

18   during the Class Period, they would not have done so at the artificially inflated prices which they

19   paid.

20       111.    By virtue of the foregoing, BigBand and the Individual Defendants each violated

21   §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

22       112.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and

23   the other members of the Class suffered damages in connection with their purchases of the

24   Company's securities during the Class Period.

25                          **COUNT V**
                  **Violation of Section 20(a) of the Exchange Act**
26                  **(Against the Individual Defendants)**

27       113.    Plaintiff repeats and realleges the allegations set forth above as if set forth fully

28   herein.  This claim is asserted against the Individual Defendants.

114.   The Individual Defendants were and acted as controlling persons of BigBand within the meaning of §20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions with the Company, participation in and/or awareness of the Company's operations and/or intimate knowledge of the Company's actual performance, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.  Each of the Individual Defendants was provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

115.   In addition, each of the Individual Defendants had direct involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

116.   As set forth above, BigBand and the Individual Defendants each violated §10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their controlling positions, the Individual Defendants are liable pursuant to §20(a) of the Exchange Act.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.     declaring this action to be a class action properly maintained pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure;

B.     awarding Plaintiff and other members of the Class damages against all Defendants, together with interest thereon;

1    C.    awarding Plaintiff and other members of the Class their costs and expenses of this

2  litigation, including reasonable attorneys' fees, accountants' fees and experts' fees and other

3  costs and disbursements; and

4    D.    awarding Plaintiff and other members of the Class such other and further relief as

5  may be just and proper under the circumstances.

6                                    **JURY DEMAND**

7    Plaintiff hereby demands a trial by jury.

8  Dated: November 14, 2007                    By: _____

                                              **SAXENA WHITE P.A**
9                                             Lester R. Hooker (SBN 241590)
                                              lhooker@saxenawhite.com
10                                            2424 North Federal Highway
                                              Suite 257
11                                            Boca Raton, FL 33431
                                              Tel: 561.394.3399
12                                            Fax: 561.394.3082

13                                            **Counsel for Plaintiff**

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS